HOGUE v. THE HOUSING AUTHORITY OF NORTH LITTLE ROCK.

4-6219                                   144 S. W. 2d 49

Opinion delivered November 4, 1940.

—PAGE 263]

—PAGE 264]

*Otis H. Nixon,* for appellant.

*Laurence J. Berger, Walter G. Riddick* and *Glenn Zimmerman,* for appellees.

HUMPHREYS, J.   This suit was brought by appellant, a citizen and taxpayer of North Little Rock, against the Housing Authority of North Little Rock, Arkansas, and the mayor and members of the City Council of said city in the chancery court of Pulaski county, Arkansas, to enjoin them and each of them from proceeding further under the Housing Authorities Act, No. 298 of the Acts of the Legislature of 1937, appearing in Pope's Digest as §§ 10059 to 10088 on the grounds that the act is unconstitutional in its entirety and, if not invalid in its entirety, certain sections thereof are contrary to certain provisions of the Constitution of 1874 and should be stricken down leaving only the sections thereof in force and effect which are constitutional and valid.

Section 29 of the act is as follows: ''Notwithstanding any other evidence of legislative intent, it is hereby declared to be the controlling legislative intent that if any provisions of this act, or the application thereof to any person or circumstances, is held invalid, the remainder of the act and the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.''

Under this severability section of the act, invalid provisions of the act might be stricken down without invalidating the whole act. *Sallee* v. *Dalton,* 138 Ark. 549, 213 S. W. 762; *Alsup* v. *State,* 178 Ark. 170, 10 S. W. 2d 9; *Conway County Bridge Dist.* v. *Williams,* 189 Ark. 929, 75 S. W. 2d 814.

The attack made upon the act as a whole is that the agency created by it and powers conferred upon the agency are private and for private purposes, and not public and for public uses and purposes. This contention is without foundation because § 2 of the act contains the Legislature's finding and declaration of the legislative purpose in passing the act. Section 2 of the act is as follows: "Section 2. It is hereby declared: (a) that there exist in the state insanitary or unsafe dwelling accommodations and that persons of low income are forced to reside in such insanitary or unsafe accommodations; that within the state there is a shortage of safe or sanitary dwelling accommodations available at rents which persons of low income can afford and that such persons are forced to occupy overcrowded and congested dwelling accommodations; that the aforesaid conditions cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the state and impair economic values; that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities; (b) that slum areas in the state cannot be cleared, nor can the shortage of safe and sanitary dwellings for persons of low income be relieved, through the operation of private enterprise, and that the construction of housing projects for persons of low income (as herein defined) would therefore not be competitive with private enterprise; (c) that the clearance, replanning and reconstruction of the areas in which insanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are exclusively public uses and purposes for which public money may be spent and private property

acquired and are governmental functions of state concern; (d) that it is a proper public purpose for any State Public Body to aid, as herein provided, any housing authority operating within its boundaries or jurisdiction or any housing project located therein, as the State Public Body derives immediate benefits and advantages from such an authority or project; (e) that it is in the public interest that work on housing projects be commenced as soon as possible in order to relieve unemployment which now constitutes an emergency; and the necessity in the public interest for the provisions hereinafter enacted, is hereby declared as a matter of legislative determination.''

One cannot read § 2 of the act quoted above and conclude that the intent of the Legislature was to create a private agent or authority for private purposes and uses. The plain and unambiguous declaration of intent therein is to the contrary. The declared intent is that it is creating a public agent or authority and conferring a power upon it to carry out public uses and purposes that are necessary. A reading of the whole act convinces us that the primary purpose or intent thereof is slum clearance by removing the evils existing therein and emanating therefrom which are a great detriment to the public welfare of our citizens generally and in the attempted prevention of which private agencies cannot successfully cope. Although courts have jurisdiction to determine what constitutes a public use as distinguished from a private use, or *vice versa,* yet in doing so it gives great weight to the declaration of the Legislature concerning the nature of the act. *Cloth* v. *Rock Island R. R. Co.,* 97 Ark. 86, 132 S. W. 1005, Ann. Cas. 1912C 1115; *Ozark Coal Co.* v. *Penn Anthracite Rd. Co.,* 97 Ark. 495, 134 S. W. 634, Ann. Cas. 1912D, 1000. Acts similar to the act attacked in this case have been enacted in many of our states and have successfully run the gauntlet of constitutional objection such as are made here and urged against the constitutionality of our Housing Authorities Act. In fact Housing Authorities Acts almost identical with ours have been declared constitutional in as many as forty decisions handed down by

the Supreme Courts in perhaps twenty-five states. The general trend in practically all the cases has been to hold that housing projects provided for in Housing Authorities Acts are for public purposes. These forty or more cases are cited in appellee's brief and support the constitutionality of the several acts against practically every ground of attack made in this case. A few excerpts from some of the cases will reflect the trend of judicial construction of this and other similar acts. In the case of *Housing Authority of the City of Dallas* v. *Higgenbotham, et al.,* 143 S. W. 2d 79, the Supreme Court of Texas said: "We are thoroughly convinced that the use to which the housing projects will be devoted is a public one."

In the case of *Housing Authority of the County of Los Angeles* v. *Dockweiler,* 14 Cal. 2d 437, 94 Pac. 2d 794, the Supreme Court of California said: "Both reason and authorities support us that the proposed elimination of slums and the erection of safe and sanitary low rent dwelling units for persons of the prescribed income will do much to advance the general welfare and to protect the public safety and morals and are in fact and in law public purposes."

In the case of *Marvin* v. *Housing Authority of Jacksonville et al.,* 133 Fla. 590, 183 So. 145, the Supreme Court of Florida said: "Low rent housing and slum clearance are valid public purposes advancing the health, morals and general welfare of the people."

In the case of *Allydonn Realty Corp.* v. *Holyoke Housing Authority et al.,* 23 N. E. 2d 655, the court said: "Money expended for low rent housing, as well as for the elimination of slums, analogous to a public nuisance, are expenditures for a public purpose since the pernicious influence of slums reaches out and effects an entire community, lowers moral standards and increases the cost of police, fire and health protection."

In the last case cited, the court also said the elimination of slums is "an object raised to the dignity of a public service."

After carefully reading many of the cases cited by appellee we are completely convinced that the Housing Authorities Act of the Acts of the Legislature of 1937 appearing in Pope's Digest as §§ 10059 to 10088 merely creates a public agency for the performance of a public purpose and that in so far as it permits or requires the expenditure of public funds by the state or by municipalities the expenditures are for public use in the promotion of proper governmental functions.

It seems almost like a work of supererogation to discuss at any length the separate attacks made upon many of the sections of the act, since lying at the very root of all the attacks is the inquiry of whether the act creates a public agency to perform necessary public service or whether it creates a private agency for private purposes and uses.

We declare broadly and without reservation that the act creates a public agency or authority to perform necessary public purposes and uses.

A careful reading of the act does not reflect that the Legislature has delegated its right to make laws to the public agency or authority. The most it does is to delegate power to the agency or authority to determine facts conditioning the operation of the law. This delegation of authority to determine facts upon which its law may operate is permissible. In the case of *Johnston* v. *Bramlett,* 193 Ark. 71, 97 S. W. 2d 631, in determining whether act No. 108 of the acts of 1935, p. 258, was unconstitutional as delegating power to make a law the court said (quoting syllabus 2): "The Legislature did not, in act 108 of the Acts of 1935, delegate the power to make a law, but it made a law, and delegated the power to the people of the county to ascertain facts upon which the law makes its action depend."

The Housing Authorities Act contains no prohibited delegation of legislative authority and is not unconstitutional on that account.

The act is not unconstitutional because same impowered the authority to exercise eminent domain in acquiring property for public purposes with which to

construct and operate housing projects. We have already said that the act establishes a public agency for the exercise of a public purpose so it was perfectly proper to confer power upon the authority in the act to condemn property for such uses. This court said in the case of *Fulton Ferry & Bridge Co.* v. *Blackwood,* 173 Ark. 645, 293 S. W. 2:

"Whenever the public convenience or necessity is involved, the power of the Legislature to delegate to a public agency power of condemnation of private property for public use is supreme."

The act is also attacked on the ground that it grants special privileges to certain citizens or class of citizens. This attack was made on an identical act and the Supreme Court of Texas in the case of *Housing Authority of the City of Dallas* v. *Higgenbotham, supra,* says: "The legislature in the law under attack has made no attempt to grant special privileges to any man or set of men, but has made a reasonable classification of the members of the public and has provided that such low rent dwelling accommodations shall be available to all members of the public who presently or in the future shall fall within the classification made by the legislature."

The same attack was made on other similar acts that had for their primary purpose slum clearance for the benefit of the public at large without effect as may be observed in the cases of *In re Brewster Housing Site in the City of Detroit,* 291 Mich. 313, 289 N. W. 493; *Edwards* v. *Housing Authority of City of Muncie,* 215 Ind. 330, 19 N. E. 2d 741, and *Krause* v. *Peoria Housing Authority,* 370 Ill. 356, 19 N. E. 2d 193, and many other cases that might be referred to.

This court is committed to the rule that the Legislature may make classification for taxation and for the exercise of a police power and that when the classifications are supported by any reasonable basis they are valid. Authority for the validity of classifications made upon a reasonable basis may be found in the following cases: *Williams* v. *State,* 85 Ark. 464, 108 S. W. 838, 26

L. R. A., N. S., 482, 122 Am. St. Rep. 47; *Kelso* v. *Bush*, 191 Ark. 1044, 89 S. W. 2d 594, and *Bohlinger* v. *Watson*, 187 Ark. 1044, 63 S. W. 2d 642.

By reading the act in a careful manner it must be seen that it does not authorize an unconstitutional loan or use of municipal credit; nor a misuse of public funds by municipalities.

Section 14 of the act specifically provides that the bonds and obligations of the agency or authority shall not be a debt of the city, county or state or any political subdivision thereof and that they shall so state on their faces and that they shall not constitute a debt within the meaning of any constitutional or statutory limitation. The language of the act itself, above quoted in substance, refutes the charge that the act is unconstitutional because it is a loan or use of municipal credit.

Again, the bonds and obligations to be issued by the public agency or authority are payable exclusively from the revenues of the agency or authority, so the credit of the city is not even involved.

The cases of *McCutcheon* v. *Siloam Springs*, 185 Ark. 846, 49 S. W. 2d 1037; *Jernigan* v. *Harris*, 187 Ark. 705, 62 S. W. 2d 5; *Snodgrass* v. *Pocahontas*, 189 Ark. 819, 75 S. W. 2d 223; and *McGehee* v. *Williams*, 191 Ark. 643, 87 S. W. 2d 46, are authority to the effect that obligations and bonds payable exclusively from the revenues of the agency issuing them are not municipal debts within the provisions of the Constitution regulating the issue of interest bearing evidence of indebtedness or within the constitutional prohibition against the loan of municipal credit. Constitution, art. 12, § 5, Amndt. No. 13; *Robinson* v. *The Incorporated Town of DeVall's Bluff*, 197 Ark. 391, 122 S. W. 2d 552.

It is also contended that the act is unconstitutional because it proposes to make donations from general revenues of the city to pay the estimated administrative expenses of the authority for its first year. We think there is nothing in this contention because the Housing Authority serves a public purpose and use and on that account and for that reason may appropriate funds

from its general revenues if it has such revenues and such an appropriation becomes necessary in the interest of the public welfare.

The Housing Authorities Act is also assaulted because it exempts the property used by the public agency or authority in the accomplishment of the slum clearing projects from all taxes. Our attention is called to a part of § 5 of art. XVI and also § 6 of art. XVI of the Constitution of 1874. That part of § 5 to which attention is called is as follows: ''All property subject to taxation shall be taxed according to its value. . . . Provided, further, that the following property shall be exempt from taxation; public property used exclusively for public purposes . . .; and buildings and grounds and materials used exclusively, for public charity.''

And § 6 to which our attention is called is as follows: ''All laws exempting property from taxation other than as provided in this Constitution shall be void.''

The Constitution expressly excepts public property and property devoted exclusively to charity, whether publicly or privately used, from taxation. The Housing Authority is a public agency and its property is public property devoted to a charitable use and as such the Legislature under the Constitution may exempt it from taxation at the hands of the state or any public body thereof.

The point is made and insisted upon that the property of the Housing Authority is not exclusively used for public or charitable purposes and that before it may be exempted from taxation such property must be exclusively used for this purpose. We think a fair construction of the act is that all the property acquired by it is to be used and will be used in the clearance of slum areas and the furnishing of safe and sanitary dwelling accommodations free from conditions of overcrowding and want of air and light prevailing in slum areas. It will be observed that in § 3 of the act a housing project is defined to mean any work or undertaking to demolish or remove buildings from a slum area, embracing the adoption of such areas to public purposes and also to

mean the provision of decent, safe and sanitary urban living accommodations. The Constitution of the state of Tennessee contains a clause authorizing the Legislature to exempt from taxation property held by the state, county or city or town and used exclusively for "public or corporation purposes." The Knoxville Housing Authority, Inc., created under the Housing Authorities Act of Tennessee, was attacked because the Legislature exempted its property from taxation and the Supreme Court of Tennessee on appeal of the case said (quoting syllabus 8): "Statute exempting property and bonds of housing authorities from all state, county, and city taxation and assessments is not unconstitutional, since, as applied to Knoxville Housing Authority, Inc., property held by such housing authority is held by the city of Knoxville within constitutional provision authorizing Legislature to exempt property held by states, counties, 'cities' or towns, and used exclusively for 'public or corporation purposes.' (Pub. Acts 1937, chap. 214; Const. art. 2, § 28)." *Knoxville Housing Authority* v. *City of Knoxville,* 174 Tenn. 76, 123 S. W. 2d 1085.

The Housing Authorities Act of Texas was attacked on the ground that it exempted the property of the agency or authority from taxation. Although the Texas Constitution does not use the words "exclusively used for charitable or public purposes" as our Constitution and the Constitution of Tennessee do yet the Supreme Court of Texas construed the Texas Constitution to mean just what the other constitutions say. In other words, the court said that in order to be exempted the property must be used exclusively for public or charitable purposes.

The Court of Civil Appeals of Texas said in the case of *City of Longview* v. *Markham-McRee Memorial Hospital,* 134 S. W. 2d 793, quoting the syllabus, that: "The Markham-McRee Hospital located in the city of Longview, Gregg county, Texas, is entitled to exemption from taxation as a 'charitable institution' devoted to 'charitable purposes' notwithstanding rental of offices in hospital to house physicians with object of having a doctor subject to immediate call at all times. Vernon's

Ann. Civ. St., art. 7150 (7); Vernon's Ann. St. Const., art. 8, § 2.''

The Supreme Court of Texas in the case of *Housing Authority of the City of Dallas et al.* v. *Higginbotham, supra,* quoting syllabus 15, said that: ''The Housing Authorities Law which declares the property of the authority to be public property, used for essential public and governmental purposes, and that such property and the authority should be exempt from all taxes and special assessments of the city, county, state or any political subdivision thereof, is not violative of constitutional provision concerning equal and uniform taxation. Vernon's Ann. Civ. St., art. 1269K, § 22; Vernon's Ann. Const., art. 8, §§ 1, 2; United States Housing Act of 1937, 42 USCA, § 1401, *et seq.*''

We, therefore, hold that the act in question is not vulnerable because it exempted the property of the Housing Authority from all taxes and special assessments by the state or any public body thereof.

The Housing Authorities Act is not void because it does not limit the location of its projects to slum areas. To so limit the act would be to read into it language which is not contained therein. The purpose of the act as stated in § 2 is the clearance of slum areas and the furnishing of safe and sanitary dwelling accommodations free from the conditions of overcrowdedness, want of air and light prevailing in the slum areas and in § 2 a housing project is defined to mean any work or undertaking to demolish or remove buildings from a slum area, embrace the adoption of such areas for public purposes and also to mean the provision of decent, safe and sanitary urban living conditions.

This act is not discriminatory against private owners of dwelling accommodations and does not take their property for public purposes or uses without due process of law and without a just compensation therefor. All property rights are held subject to the state's police power and in the exercise of the police power the state has full power to establish and enforce all regulations reasonable and necessary to secure the health, safety and

general welfare of the community. *St. Louis-San Francisco R. R. Co.* v. *State*, 182 Ark. 409, 31 S. W. 2d 739; *Euclid, Ohio,* v. *Ambler Realty Co.*, 272 U. S., 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016.

We have not set out the co-operation contract between the city of North Little Rock and the Housing Authority for the reason that it is quite lengthy. We have read it very carefully and we think all of the provisions therein are specifically authorized by the Housing Authorities Act, and that same is in no sense *ultra vires.* It is a valid agreement between the city and the Housing Authority.

In closing, we quote from the case of *Dornan* v. *Philadelphia Housing Authority,* 331 Pa. 209, 200 Atl. 834: ''Moreover, views as to what constitutes a public use necessarily vary with changing conceptions of the scope and functions of government, so that today there are familiar examples of such use which formerly would not have been so considered. As governmental activities increase with the growing complexity and integration of society, the concept of 'public use' naturally expands in proportion.''

Along the same line we also quote from Mr. Justice Holmes in the case of *Block* v. *Hirsh,* 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165, as follows: ''Plainly circumstances may so change in time or so differ in space as to clothe with such an interest (public interest) what at other times and at other places would be a matter of purely private concern.''

The chief attacks which have been made in all the courts against the Housing Authorities Act have been that they do not create public agencies which have to do with public purposes and uses, but that they create private agencies for private purposes and uses and so the two quotations above are quoted in this opinion as arguments against treating such acts as being for private purposes instead of for public purposes and uses.

The time has certainly arrived for the public to assume the burden of slum clearing to the end that the public health generally may be conserved.

The decree of the trial court is in all things affirmed.

SMITH and MEHAFFY, JJ., dissent.

SMITH, J. (dissenting). If a generous and sympathetic uncle should announce that he proposed to distribute his income among his nephews and nieces (and others, possibly), and that he would augment the sum he proposed to distribute with other funds which he had borrowed, we might reasonably expect many hands with upturned palms to be extended to receive a fair share (and, in some instances, perchance, something more) of the bounty.

It is with regret, therefore, that I am constrained to conclude that there are constitutional objections to portions of the housing act under which the city of North Little Rock will share in the munificence of the federal government by having a proposed housing project for that city. My regret is somewhat assuaged, however, by the fact that a majority of my associates do not concur in the views which I entertain.

It may be freely conceded—and I do not hesitate to make the concession—that so far, at least, as appears from the briefs filed in this case, these housing projects have been uniformly sustained.

The latest case on the subject is that of *Housing Authority of the City of Dallas* v. *Higginbotham,* 143 S. W. 2d 79, and this case cites the others also cited in the majority opinion. The Texas case primarily involved the right of the Housing Authority of the city of Dallas to condemn property, and it was held that the right existed. It was also held that the housing authority was exempt from taxation; but the provisions of the Texas Constitution, on the subject of exemption from taxation, quoted in that opinion, do not require, as does the Constitution of this state, that the property, to be exempt, shall be used exclusively for public purposes.

However, in the case of *Knoxville Housing Authority, Inc.* v. *City of Knoxville,* 174 Tenn. 76, 123 S. W. 2d 1085, it was held by the Supreme Court of Tennessee that the housing authority property was exempt from

taxation, although the Constitution of that state is substantially identical with that of this state, in requiring that the exempt property shall be used exclusively for public purposes. In that opinion the Supreme Court of Tennessee also held the bonds issued by the housing authority to procure money to construct the improvement were also exempt from taxation.

We have, however, decided that such bonds could not be exempted from taxation in this state in the case of *Jernigan* v. *Harris*, 187 Ark. 705, 62 S. W. 2d 5. There was involved in that case the validity of acts 131 and 132 of the 1933 general assembly. Act 131 provided the means whereby cities and towns of the state might purchase, construct and improve waterworks systems, and operate them. Act 132 authorized the cities and towns of the state to construct, own, equip, operate, maintain and improve sewage plants. Sewers and waterworks are not only property used exclusively for public purposes, but they are property which, from their very nature, cannot be used for other purposes. These were intended to be self-liquidating projects, and those acts were upheld notwithstanding their partial invalidity. To encourage and make possible those improvements, and to induce purchase of the bonds, with the proceeds of which the improvements were to be constructed, the acts provided that bonds might be issued and sold for that purpose, and should be exempt from taxation. We there held invalid this exemption from taxation, when the bonds were held by any person or agency whose property is not otherwise exempt from taxation.

I have not taken the trouble to inquire what states, besides Tennessee, whose courts have upheld exemptions of the housing authority from taxation, have a constitutional provision similar to our own. There may be others, but, if so, those cases would be persuasive only that we should give our constitution a similar construction, and are not compelling that we do so.

I find no constitutional objection to housing projects as such, and there are only three provisions of our act on the subject which I think are invalid. These are

found in §§ 23, 24 and 26 of the act, which appear as §§ 10081, 10082 and 10084, Pope's Digest, and the purpose of this dissenting opinion is to discuss the objections to those sections, which I am unable to reconcile with our own constitution, but which do not, in my opinion, render the entire act invalid, as its various provisions are separable.

Of necessity, the right of eminent domain was conferred upon the authority, otherwise the construction of the improvements would be impracticable, if not impossible. As a practical matter, it may be necessary to exempt them from taxation, to enable them to function. But, even so, this fact cannot affect our constitution. It must stand even though the housing authority must **fall.**

I am willing to agree—with some misgiving—that the right of eminent domain could be conferred upon the housing authority; but I think it does not follow that the property may also be exempted from taxation.

There is a very extensive annotation to the case of *Ferguson* v. *Illinois Central Railroad Co.,* 202 Iowa 508, 210 N. W. 604, found in 54 A. L. R., Vol. 1, upon the right to acquire property by eminent domain for a public use. After citing cases from many states and by the federal courts, the annotator says: ''The weight of authority supports the general proposition that the term 'public use' under the law of eminent domain is not the equivalent of public benefit, public convenience or welfare, but that, in order to make the use a public one for which the power of eminent domain may be exercised, there must be a right on the part of the public, or some portion of it, or some public or quasi public agency on behalf of the public, to use the property after it is condemned. Under this rule, the test is the legal right of the public, or some portion of it, independent of the mere will or caprice of the owner; in other words, the use must exist as a matter of right, and not of favor. The courts have properly pointed out that almost any legitimate business enterprise, indirectly to some extent, may be regarded as of benefit to the public, and that an

indefinite field is opened up when the doctrine is accepted that public benefit alone is sufficient to make the use a public one, warranting the exercise of the power of eminent domain.''

The line of demarcation drawn by the cases, holding, in some instances, that the right of condemnation exists, while, in others, that it does not, is not always clear.

In volume 1 (4th Ed.), Cooley on Taxation, § 176, p. 385, it is said: ''A more liberal construction of public purposes is consequently admissible in the law of eminent domain'' (than is admissible in exempting the property from taxation), ''where an error in the direction of too great liberality could not be seriously detrimental, than in the law of taxation, where a like error would result in injustice which might be seriously harmful.''

It is my conclusion, therefore, that, while the right of eminent domain may be conferred upon the authority, the right of exemption of its property from taxation may not be claimed, for reasons now to be stated.

No one questions the benefit of the housing authority to the community in which it may be located, and I certainly do not. The removal of slum districts anywhere is something greatly to be desired. So, also, would be the improvement of the living conditions of many persons in this state who, through adverse conditions, are required to live in squalid surroundings. In many parts of this state, and especially in rural sections and on the farms of the state, are to be found homes having no baths, nor indoor toilets with running water connections, nor facilities for sewage disposal, nor screened doors and windows, and other desirable modern conveniences. The improvement of these homes, and the removal of these conditions, would be a great boon to the public generally; but it cannot be that so improving any one of such homes, or all of them, for that matter would make them, or any one of them, buildings ''used exclusively for public purposes,'' as they must be before they can be exempted

from taxation under the provisions of our constitution. Article 16, § 5.

There is, in my opinion, no difference, in principle, between building a large house, where a number of persons may reside, and building a single house, where only one family may reside. The benefits are greater in one case than in the other; in that, they affect more people in one case than in the other; but the difference is only in degree, and not in principle. There would be a public benefit in either case, but in neither case would there be a building to be "used exclusively for public purposes."

It is not proposed or contemplated that the buildings which the housing authority will erect shall be used exclusively for public purposes, or, for that matter, for any public purpose. When erected, the buildings will be rented to tenants, at a rental more or less nominal, which may or may not be collected, and each tenant will be assigned his respective space, from which he may exclude, or eject, all other persons and the public generally.

It appears to me to be a contradiction in terms to say that the properties of the housing authority will be devoted to a public use, when its express purpose is to limit the use to a restricted portion of the public, these being persons of small income. It may be conceded that these are the persons having greatest need for aid; but it cannot be a public use if only a restricted portion of the public may ever use it.

It was held by this court in the case of *Cloth* v. *Chicago, Rock Island & Pacific Ry. Co.*, 97 Ark. 86, 132 S. W. 1005, Ann. Cas. 1912C, 1115, (to quote a headnote), that "In order to constitute a public use, it is necessary that the public shall be concerned in such use, and the purpose for which the property is to be used must in fact be a public one."

The distinction which the cases make—and which I think should be observed—is between public benefit and public use. A public benefit is not sufficient. A public use is essential.

In the notes "(a), (b) and (c)" to § 94 of the chapter "Public" in 50 C. J., p. 865, many cases are cited to support the statement of the law, there found, that " 'Public benefit' is not synonymous with 'public use.' "

It will be observed that § 23 of the housing act. which appears as § 10081, Pope's Digest, not only exempts the property of the housing authority from general taxation, but also exempts it from special assessments which may have been previously imposed. It is a matter of common knowledge that in many of the cities and towns of this state improvement districts were organized which levied special assessments to furnish water, sewerage, streets, sidewalk, etc. The housing authority act attempts to exempt the property of the authority from the payment of these taxes, although it is graciously provided that "an authority may agree to make payments to a state public body for improvements, services and facilities furnished by such state public body for the benefit of a housing project, but in no event shall such payments exceed the estimated cost to such state public body of the improvements, services or facilities to be so furnished."

In other words, the assessments of benefits, upon the security of which bonds may have been—and usually were—sold, to provide money to install an improvement, are annulled. They cease to be liens upon so much of the property within the improvement district as the housing authority acquires for its own purposes, and, *pro tanto*, the contract between the improvement district and the holders of its bonds is discharged, although the housing authority "may agree to make payments," which, in no event, shall exceed the estimated cost to the improvement district of the services furnished. This wholly ignores the theory upon which the special assessments were levied by improvement districts, which are assessed against the betterments or enhanced values of the property as a result of the improvements.

Section 24 of the act which appears as § 10082, Pope's Digest, provides that the absence of a contract (under which the authority may agree to pay for services) shall in no way relieve any state public body from

the duty to furnish, for the benefit of said housing project, customary improvements and such services and facilities as such state public body furnishes customarily without a service fee.

It is easily conceivable that, although the housing authority might agree to pay, it might also fail to do so. Nevertheless, the lien for the betterments assessments has been removed and annulled. The housing authority act does, by its express terms, exempt the properties of the authority from taxation. But a higher authority for the exemption must be found. There is no exemption from taxation unless the constitution so provides. There are certain other properties exempt from taxation by the constitution, but they have no relation to the subject here considered, and any discussion of them would only confuse. That the general assembly cannot exempt any property from taxation, and that a statute attempting to do so is void, is settled by many decisions of this court. Among others are: *Little Rock & Fort Smith Ry. Co.* v. *Worthen*, 46 Ark. 312; *Fletcher* v. *Oliver*, 25 Ark. 289; *Wells-Fargo & Company's Express* v. *Crawford County*, 63 Ark. 576, 40 S. W. 710, 37 L. R. A. 371. A later case, citing others, is *Tedford* v. *Vaulx*, 183 Ark. 240, 35 S. W. 2d 346. See, also, *Huntington* v. *Worthen (Little Rock & Ft. S. R. Co.* v. *Worthen)*, 120 U. S. 97, 7 S. Ct. 469, 30 L. Ed. 588.

The exemption of the property of the housing authority from taxation must, therefore, under our Constitution, in my opinion, be denied.

Section 26 of the act (§ 10084, Pope's Digest) must, in my opinion, also fall, as being in excess of any power possessed by the General Assembly. This section authorizes the seizure of any unappropriated funds belonging to a city or county in which a housing authority may be found, or so much thereof as may be necessary, to pay the administrative expenses and overhead of the authority during the first year of its operation. It is not, in my opinion, within the power of the General Assembly to so appropriate and dispose of the revenues of either a city or a county. The act does not do so directly, but it

does so effectively by requiring "the governing body of the city or county (as the case may be)" to make the appropriation.

Among other many objections that might be offered to conferring power upon the housing authority to compel a city or county to take this action, is the probability —and, in many cases, the certainty—of requiring the city or county to violate amendment No. 10, which amendment requires both cities and counties to live within their annual income. Either a city or a county might have outstanding obligations (contractual or statutory) which it could discharge with its unappropriated funds, which it would be unable to discharge if it were required to divert its funds to another purpose.

For the reasons stated, I think the exemption from taxation and the diversion of the funds, of either a city or a county, are unauthorized. Mr. JUSTICE MEHAFFY concurs in this view.